Plaintiff has filed this suit against Dr. Charles J. Barker, as Sheriff, and who was sheriff at the date the cause of action is alleged to have arisen; and against Emile Rodrigue and Emile Toups, who were deputy sheriffs under Dr. Barker on that date, and has also joined the United States Fidelity and Guaranty Company, the Sheriff's official insurer.
Plaintiff alleged that on the night of September 16th, 1947, about 9:30 P.M., he passed the home of Mrs. Edgar Toups in Lockport, Louisiana; that he noticed a man in the rear of the Toups' yard and he entered the side gate of the Toups' property to ascertain who was lurking in this rear side yard, and that when he had entered the yard a distance of about six feet, defendants Rodrigue and Toups rushed from behind a tree in the yard and grabbed plaintiff and advised him that he was being arrested as a "peeping tom." Plaintiff alleged that he protested the arrest and denied the charge, whereupon both Rodrigue and Toups began to beat him about the head and body with a black jack and *Page 512 
lead pipe; that they struck him about fifteen times and, as a result of the blows, plaintiff's left eye ball was crushed and ruptured and he received numerous contusions about the head and had three false teeth knocked out. He alleged that he was then placed in an automobile, owned and driven by Junior Toups, and driven to Thibodeaux, Louisiana, parish seat of Lafourche Parish, by the two deputies in order that he might be placed in jail; that on the trip to Thibodeaux he lost much blood and was in great pain and fear, and requested medical attention which was refused with threats by the said deputies, Toups and Rodrigue; that the deputies were in the act of placing plaintiff in jail when Edward J. Bourgeois, Chief Deputy Sheriff, saw plaintiff's bloody condition and took plaintiff from the custody of Toups and Rodrigue and took him to St. Joseph's Hospital in Thibodeaux, Louisiana, where he was immediately hospitalized and, on doctor's orders, was transferred by ambulance next day to Charity Hospital in New Orleans, where his left eye was removed and in which hospital he remained sixteen days recovering from the injuries received from Deputy Sheriffs Toups and Rodrigue. He further alleged that he was at all times submissive to arrest and that blows were unnecessarily inflicted on plaintiff by the deputies, who were acting in their official capacity in making and maintaining the arrest; that the deputy sheriffs had been advised that on the night previous to the arrest someone had been prowling in the yard of Mrs. Edgar Toups, mother of the Deputy Sheriff Emile Toups, and the two deputies had concealed themselves in the yard prior to the time plaintiff entered for the purpose of apprehending any trespasser; that the deputies had been authorized by the Sheriff, Charles J. Barker, to so conceal themselves and make any arrest of any outsider entering the yard.
Plaintiff prayed for damages in the amount of $15,224.50 which was the amount itemized by him as due for the loss of his eye and teeth, pain and suffering and other injuries received by him, together with expenses incurred on account of same.
A joint answer was filed by all the defendants in which they admitted that Rodrigue and Toups were Deputy Sheriffs of Lafourche Parish at the time of the arrest; that they concealed themselves in the yard to make any needed arrest with the approval of Sheriff Barker, and that all their acts were in connection with the arrest while in their official capacity as Deputy Sheriffs. They further answered that plaintiff came on the premises of Mrs. Edgar Toups illegally and started toward a lighted window in the house, whereupon the two deputy sheriff's arose and shouted at plaintiff to "Stop — you are under arrest;" that when said defendant Emile Toups was within arm's length of plaintiff to place him under arrest, plaintiff "ferociously and madmanlike resisted arrest; plaintiff, without just cause or provocation, and without uttering a single word, then and there began to swing both of his arms and hands at this said defendant; struck this said defendant a number of times with his hands and closed fists and with all of the brutal physical force at his command; scratched said defendant on his left arm and thereby caused it to bleed; plaintiff then and there proceeded to also physically fight off in every physical fashion at his command all efforts of this said defendant to subdue him, plaintiff, in said defendant's attempt to place him, plaintiff, under arrest, during all of which time your said defendant was attempting to hold plaintiff so that your other defendant, Emile Rodrigue, might place hand-cuffs upon plaintiff, and when plaintiff was so resisting, as aforesaid, the efforts of the said Emile Toups to so place him under arrest, and while plaintiff was striking your said defendant, Emile Toups, and scratching him as aforesaid, and while so refusing to submit to arrest, in an effort to subdue plaintiff to there place him under arrest, and in an effort to defend himself against, and to repel the said illegal and unprovoked assaults and batteries being then and there committed upon defendant, Emile Toups, by plaintiff, as aforesaid, defendant, Emile Toups, did, for such purposes, strike plaintiff twice about his body but not on his head or face, with a rubber billy which did not and could not commit the injuries complained of by plaintiff, the said Emile Toups at all times using no more force than was necessary to effect *Page 513 
such purposes; that said rubber billy was of standard regulation and make, such as is used by law enforcement officers everywhere, and used and effective only for the purpose of stunning any law violator resisting arrest and for the purpose of merely subduing any law violator who might physically resist actual arrest, as plaintiff was then and there doing; that said two blows neither injured nor stunned plaintiff;"
"That all the while your defendant, Emile Toups was attempting to subject plaintiff to arrest and to defend himself against plaintiff's assaults, as aforesaid, your other defendant, Emile Rodrigue, was attempting to place hand-cuffs on plaintiff; that, while this said defendant, Emile Rodrigue, was attempting to so place hand-cuffs on plaintiff for the purpose of terminating his said resistance to arrest and to physically bring about his arrest, he, plaintiff, also struck defendant, Emile Rodrigue, about the body and face, including a blow in his mouth which cut the said Emile Rodrigue's lips and mouth, causing his said mouth to bleed as a result of such blow;"
Defendants allege that plaintiff received his injuries when he, "fell to the ground on such rear gate chain to which was attached the said cement block weight, plaintiff falling to the ground face downward on said chain and cement block, * * *" and that: "such injuries were suffered by plaintiff when he fell to the ground at the rear gate of the said residence premises of the said Mrs. Edgar Toups in the manner herein above recited, where his face struck the rear gate chain and cement block while resisting arrest, all as aforesaid, causing to himself, plaintiff, the injuries about which he here complains, as a result of striking his face on said chain and cement block weight."
Defendants further aver that at no time did they or either of them use upon plaintiff any more force than was reasonably and absolutely necessary to bring about his arrest and to defend themselves against plaintiff's assaults and batteries.
The case was duly tried and the District Court for the oral reasons dictated, which are in the record, rendered judgment in favor of the defendants dismissing plaintiff's suit at his costs. From this adverse judgment, the plaintiff has appealed.
The record contains approximately three hundred pages of testimony, a great deal of which is immaterial under the pleadings and issues before the Court, as it makes no difference whether plaintiff was guilty of being a "peeping tom" or not. It is admitted that the deputies had the right to arrest him as a trespasser. It is the manner and method of the arrest of which the plaintiff complains. Of course, plaintiff denies the charge that he was a "peeping tom."
The facts reveal that Mrs. Edgar Toups who was the mother of the defendant and deputy sheriff, Emile Toups, had complained to him that on the night previous to the arrest of the plaintiff some one had prowled about the premises and peeped in at the window. Toups thereupon obtained the assistance of the defendant and deputy sheriff, Emile Rodrigue, to sit in the yard and see if they could not apprehend the so-called "peeping tom." The plaintiff testified that he was twenty-four years of age, never married, and had lived in Lockport for the last fourteen years except for approximately six months spent in the Military Service. He was discharged from the service with an honorable medical discharge. He was five feet eight and one-half inches tall and weighed 151 pounds. Plaintiff was well acquainted with Mrs. Toups and, on the night in question, September 16th, 1947, at about nine P.M., was walking past her home on his way to his home when he stated that he noticed some man among the trees in the rear of the yard. Plaintiff finally went to the gate opening into the side yard of the Toups' home, which gate was about sixty feet from the main highway. This gate had a chain running from the inside of it to a post, and attached to this chain was a cement block about midway of it, and this block remained suspended above the ground at all times, and when the gate was opened the weight of the block was supposed to pull the gate closed. However, the gate had evidently sagged and caught on the ground and, therefore, remained open. This was the condition as shown by a *Page 514 
picture offered by defendants. Plaintiff testified that he went through this gate into the Toups' yard to find out, if possible, the identity of the man he claims he saw in the yard, and then to notify the Toups' family. He stated that when he got within about six feet inside the yard, the two deputies, Toups and Rodrigue, rushed from behind the trees and called to him, "Halt — you are under arrest," and also threw a flashlight in his face which temporarily blinded him. Plaintiff recognized both Toups and Rodrigue as he was well acquainted with them and knew they were deputy sheriffs.
Plaintiff stated that when he sought to explain his presence in the yard, both deputies began to beat him about the head and body. Plaintiff was of the opinion that he was struck with a billy and a lead pipe and he saw a billy in Rodrigue's hand but did not know with what weapon Toups struck him. Plaintiff estimated that he received about fifteen blows, most of them being on the skull and face. He testified that one of the first blows he received landed in his left eye, although he did not know which one of the deputies struck which blows. He testified that he was never knocked off his feet and denies falling down at any time.
It is proven by the testimony that plaintiff had two bumps on the right side of his head, a bruised spot over his right ear, a severe eye injury which resulted in the remains of the eye being removed, and a bruise underneath the left arm between the shoulder and the elbow. Plaintiff also suffered the loss of three front false teeth, which he testified was due to a blow in the mouth struck by Rodrigue when his mouth was open due to the fact that he was calling for his brother. The testimony reveals that plaintiff suffered no injuries to his nose, mouth or lips, but that his left eye-lid was badly discolored.
As Deputy Sheriff Toups was using a truck, he got his brother, Junior Toups, to take plaintiff, himself, Rodrigue and a Mr. Lonnie Hargis, who was also a deputy sheriff, to Thibodeaux where the jail was located, in order to place plaintiff in this jail. On the way to Thibodeaux, when they were near Raceland, Junior Toups flagged down a Mr. R. D. Chapman who was traveling on the highway and who stopped and came over to the Toups' car where, plaintiff says, that Rodrigue told Chapman, "We have the peeping tom and he is well fixed." Chapman threw a flashlight into the back of the car and looked at plaintiff. Plaintiff states that he asked for a doctor when they passed the residence of the Parish Coroner, Dr. Guy Jones, whereupon Rodrigue handed a blackjack to Hargis and told him to give plaintiff a few more licks if he asked for a doctor any more. Also, on the way to Thibodeaux plaintiff testified that Rodrigue stated he was not sorry for what they had done to plaintiff — that he was in the Military Service only six months. It is admitted that the deputies did not stop at any time to secure medical attention for the plaintiff.
Plaintiff testified that the deputies did not have a key to the jail and he sat down on the jail steps while one of them went to the home of Edward Bourgeois, Chief Criminal Deputy, who lived near by, in order to get the key to the jail; that while he was waiting he heard defendant Emile Toups say that if the plaintiff wasn't sent to the "pen" or Jackson and if he returned to Lockport that he would kill him. Plaintiff testified that Bourgeois came over to the jail and saw his condition and stated that he could not put him in jail but that he had to take him to a doctor. It was at this time that the handcuffs were taken off of the plaintiff, and Bourgeois then took plaintiff to St. Joseph's Hospital, accompanied by Lonnie Hargis. Plaintiff was there turned over to Dr. Charles R. Daunis, who examined him and gave him emergency treatment. He remained in the hospital that night and next morning was examined by Dr. Guy Jones, Coroner of the Parish of Lafourche. Later that day he was taken to Charity Hospital in New Orleans where his left eye was removed and where he remained some sixteen days. A glass eye was put in place of the eye that was removed.
Plaintiff testified that he suffered intense pain and especially with head pains *Page 515 
for eleven or twelve days. He testified that it would be necessary to obtain a new dental plate in order to replace the three teeth that were knocked out, which would cost him $150.00; that his glass eye had cost him $27.50; that he had paid $21.00 to the St. Joseph Hospital in connection with his injuries, and $37.00 to Dr. Daunis for medical services and $10.00 for medicine, making a total of $245.50.
Edward Bourgeois testified that at the time of Dufrene's arrest he was Chief Criminal Deputy Sheriff under Sheriff Barker; that the defendants, Toups and Rodrigue, brought the plaintiff to Thibodeaux to place him in jail; that as soon as he saw plaintiff, he noticed a small amount of blood on his shirt and blood coming from his eye and he "figured it might be a little serious," so he told the officers he was going to take the plaintiff to the hospital. At this same time, he also noticed a discharge from the eye which "looked like glue," and noticed that plaintiff had a couple of teeth missing. He and Lonnie Hargis took the plaintiff to the hospital and had Dr. Daunis look at him, and it was under this doctor's advice that they left him in the hospital. This witness stated that he did not talk to the two deputies about the case, that he did not take time to find out anything about it, and when he was asked the question, "You were rushing, in other words," he answered: "I wouldn't say rushing, but I did think the boy needed to goto a doctor, I will say that." (Italics ours.)
Mrs. Roland Price, a sister of the plaintiff, testified that she came to Thibodeaux on the morning of September 17th and went to the hospital to see her brother. She testified that he had one big bump and a small one on the right rear part of the head, a bruise on his right ear, a bruise under his left arm, and a bandage over his left eye. She accompanied the plaintiff in the ambulance to the Charity Hospital in New Orleans. She testified that his shirt was torn on the front just below the collar, but that he had no bruises other than those stated above.
The defendant and Deputy Sheriff Emile Toups testified that he and his co-defendant, Rodrigue, concealed themselves in his mother's yard in order to apprehend, if possible, a prowler who had been there on the previous night. Plaintiff eventually came into the yard and when he got close to the lighted window, he was ordered to halt with the statement that, "You are under arrest." Toups stated that the plaintiff backed up and tried to get back to the gate, and when he did, Toups threw a flashlight on him and attempted to catch him by the arm. He described plaintiff as being like "a wild man." He testified plaintiff started striking at him and did strike him and his left arm was bleeding. He testified that he pulled his billy out of his pocket and hit plaintiff twice but that the blows did not affect him at all. He stated that the plaintiff then turned around and struck the defendant Rodrigue in the face, and he, Toups, then grabbed plaintiff from the back around the waist and that is when they fell near the little side gate. He testified that the plaintiff dragged him through this gate and it was after they had gotten through the gate that Rodrigue was able to put the handcuffs on him. Toups stated that Rodrigue did not strike the plaintiff at all. He also testified that when he and the plaintiff fell on the ground, that he fell on top of plaintiff; that plaintiff fell face down, and while he, Toups, did not fall on the chain and block, he thinks that the plaintiff did. He stated that he did not believe he had struck plaintiff on the head. This witness also testified that when the defendant Rodrigue was snapping the handcuffs on the plaintiff, he let out a scream. Plaintiff contends that when he got outside the gate, he screamed for his brother and it was while he had his mouth open that Rodrigue struck him with his billy and knocked three false teeth out. Toups testified that after they had gotten him subdued, they put him in the back of Junior Toups' automobile to bring him to jail in Thibodeaux. He denies seeing any blood on the plaintiff or noticing his condition until after they got to the jail. *Page 516 
The defendant, Rodrigue, testified to approximately the same facts as Toups. He stated that he and Toups were concealed in the yard, and when they called to the plaintiff to halt, that he was under arrest, the plaintiff tried to get back to the gate and began "swinging like a wild man"; that he struck the defendant Rodrigue once in the mouth and scratched the arm of the defendant Toups. Rodrigue did not know whether Toups struck the plaintiff or not but he saw the plaintiff and Toups fall at the gate. It was after they had gotten up and outside the gate that he was able to put the handcuffs on the plaintiff. This defendant denies striking the plaintiff at all. Rodrigue also denies that on the way to Thibodeaux the plaintiff asked for a doctor and he told Hargis, who was on the back seat with plaintiff, if plaintiff asked for a doctor again, "Here is the black jack — let him have it a couple of more times over the head." It was proven that Rodrigue had struck a number of people with a billy on previous occasions, either in placing them under arrest or after they were under arrest. Rodrigue further testified that he was carrying both his pistol and billy that night.
Lonnie Hargis testified that he was a deputy sheriff and that he rode on the back seat of the car the night Dufrene was being brought to the Thibodeaux jail. He testified that Dufrene did ask for a doctor and he told him they would get a doctor as soon as they got to Thibodeaux. He testified that on the way to Thibodeaux, plaintiff was talking and Rodrigue told him to shut up and told Hargis to give him "a little lick and he will shut up." Although Rodrigue denied this in his testimony, as well as Toups, this proves the truthfulness of that portion of the plaintiff's testimony.
Ed. J. Toups, Jr. was called as a witness on behalf of the defendants. He testified approximately the same as the defendants Emile Toups and Rodrigue as to the trip from Lockport to Thibodeaux. He was the brother of the defendant, Emile Toups.
R. D. Chapman was also called as a witness on behalf of the defendants and testified that he met Emile Toups, Emile Rodrigue, Lonnie Hargis and Junior Toups with the plaintiff on the highway between Raceland and Lockport; that they stopped him and he came over to their car, and flashed his flashlight on the plaintiff but that he could not tell very much about him. He testified that he did not remember making a statement to the effect that the plaintiff was the "peeping tom."
Dr. Charles R. Daunis, who was called as a witness for the plaintiff, testified that he was on duty at St. Joseph Hospital in Thibodeaux on the night of September 16th, 1947 when the plaintiff, Dufrene, was brought in by the two deputy sheriffs; that his face was bloody and he was in extreme pain; that his left eye was "ruptured" and that the lens of his eye was on his cheek; that he found three front teeth fractured from his dentures and there was swelling on the right rear part of his head. He further testified:
"Q. Doctor, you say his face was bloody. If you will be kind enough will you elaborate more on that? How much blood was there? A. Over the left eye. There was very much blood so much so that I wasn't able to examine the patient until the blood was removed by one of the nurses. The blood was over the eye socket and on the cheek. One of the nurses washed the blood off for me and then only was I able to evaluate the extent of his injury.
"Q. Had there been any indication of bleeding for some time as far as you could determine? A. The blood was coagulated, clotted."
Dr. Daunis also testified that it would be impossible to say whether the plaintiff's eye had been cut or ruptured by a blow, but that it could have been caused by a blow in the eye. The doctor testified that the swelling or bruise on the rear of plaintiff's head was approximately an inch and a half or two inches in diameter and approximately an elevation of one-quarter to one-half inch and that at the time plaintiff was in the hospital he was in extreme pain. He further testified that "Any object larger than the size of the opening would not touch the eyeball. The *Page 517 
eye normally does not protrude beyond this ridge of the frontal bone." The plaintiff had no other injury, according to the doctor, on his face other than to his eye. Dr. Daunis further testified:
"Q. You said you couldn't tell whether this cornea had been out or whether the injury was caused by a blow? A. That's correct.
"Q. You couldn't tell? A. It would be presumed it was by ablow, because of the discoloration of the surrounding tissues. (Emphasis ours.)
"Q. You would have no idea how the blow was inflicted? A. No, I have no idea.
"Q. Could such a blow have been inflicted by Dufrene falling down on the sharp edges of a block with a chain? A. Do you ask me if the laceration of the cornea could have been causing by falling against a sharp rock or the injury to the cornea plus the discoloration.
"Q. Yes. A. Both injuries, the discoloration of the upper and lower lids and the laceration could not have been jointly caused by a sharp instrument. They could not have been jointly caused simultaneously by a sharp instrument.
"Q. But it could be inflicted. A. I might, for instance, be struck in the eye with a pocket knife and then struck with a blunt instrument.
"Q. Couldn't he have fallen on the square edge of a cement block that could have cut that eye? A. I don't think it would have cut it in the manner described. The laceration was straight across."
Dr. Thomas Casanova testified that he was at Charity Hospital on September 17th, 1947, when the plaintiff was brought there for treatment; that he found a laceration of the cornea of the left eye with "herniation" of the eye contents and "contusions of the periorbital area;" that by "herniation" of the eye content he meant extrusion of the eye content through laceration. He also found at that time that the three upper front teeth were missing and there were multiple abrasions and contusions or bruises about the right side of plaintiff's head. There were also area contusions and abrasions about the thorax or chest. This doctor testified that "it was very suggestive that the patient may have suffered from blows by some blunt instrument. In my opinion, the laceration about the eye and contusions about the head and body were caused by trauma of a blunt instrument." Dr. Casanova testified that it was necessary to remove plaintiff's left eye.
Dr. Guy Jones was placed on the stand by defendants and testified that a laceration is caused by an instrument of some sort that will cut, while a rupture is similar to a blow out; that he had read the testimony of Dr. Daunis with regard to the injuries suffered by the plaintiff and it was his opinion that such an injury could have been suffered by the plaintiff in falling on the chain and supporting cement block which was tied to Mrs. Toups' gate. He further testified that for the plaintiff to have suffered an injury by a blow, it would have to have been struck at an exact angle. "It would have to hit the eye just this way — to cause a rupture of that eye. Any other way it wouldn't effect the eye at all. It would have to hit it right this way — laterally."
"By Mr. McCain: We would like the record to show that the witness in demonstrating that the injury could be caused by the blackjack that he held the blackjack parallel to the floor or ground horizontally with the end of the billy exactly between the frontal bone and the maxilla. A. And not hitting the nose."
Dr. Jones testified that if the plaintiff had been hit in just that manner it could cause a rupture but not a cut, but it was his testimony that he could have fallen on the cement block and have had a cut or laceration of the eye. Dr. Jones saw the plaintiff at the Thibodeaux Hospital but did not make a complete or close physical examination and could only testify that there was a laceration of the cornea and the eye had to be removed. Dr. Jones did testify that you could put the blunt end of a pencil in the laceration of plaintiff's eye without tearing it any more. *Page 518 
The judge of the District Court, in his written reasons for judgment, stated:
"During the course of the argument counsel for plaintiff made this accurate statement, that if the injury that plaintiff suffered was caused by blackjack judgment should be for plaintiff, but that if the injury was caused by falling on the block, that is, by some force or instrument other than the blackjack, judgment should be for the defendants."
As we read the testimony, the deputies deny that they struck the plaintiff in the head at all. Deputy Toups alleged and testified that he struck plaintiff twice about his body but not on his head or face. In the petition, it is set up that the plaintiff had received his injuries as a result of falling on the cement block, which block was shown to be approximately six by eight inches and, from the picture, is somewhat in a square shape. There is no dispute but that plaintiff's injuries came after he got in the yard and were either inflicted by the deputies or received in the manner testified to by the deputies. We are of the opinion that plaintiff's injuries were inflicted by these two deputies. It would appear impossible for plaintiff to have fallen face down on the stone and received his eye injury as well as the bumps on the back of the head and on his right ear and under his left arm. We believe this for the reason that had he fallen face down on the stone with Deputy Toups' added weight on his back (the testimony showed Toups weighed approximately 235 or 240 pounds) it would have been physically impossible for the plaintiff to have fallen in this manner without bruising other parts of his face such as his nose, cheeks or forehead, and, also, this version could not take into account the other injuries shown by the testimony. Surely he could not have fallen and received them all at one time. We are of the opinion that he did not fall; that this testimony is an after thought on the part of the two defendants to account for the most serious injury plaintiff had, to-wit: his eye injury. If he had fallen on the ground and struggled as viciously as these two deputies would have one believe he did and had wrestled with Deputy Toups, there was no way to keep his clothes from showing evidence of it, at least by being very dirty, and there is no mention made of his trousers being torn or dirty or of his shirt being dirty. The testimony shows that his shirt was torn beneath the collar, which, in our opinion, is where the deputy grabbed him.
Also, it is the testimony of Doctors Daunis and Casanova that the eye condition was the result of having been struck by a blunt instrument as his eyelids were also discolored, and had it been a sharp instrument, it would also have cut the eyelid. Furthermore, there is no testimony that would prove that his eye came in contact with a sharp instrument. The answer did not set up any such state of facts, as, for instance, that his eye was injured by running into a sharp branch, which theory was advanced by the deputies on the trial of the case as a possibility, although they did not testify that that was the means by which he received his injury. The answer did not set up that his injuries were the result of necessary force used to effect his arrest, in fact, the answer denies that the injuries were inflicted by the deputies at all.
Therefore, from the issues in the case, it is only necessary to decide whether he fell on a stone and suffered his injuries, or whether they were inflicted by the deputies. Another fact in the case in which we think the plaintiff is telling the truth is the manner in which he lost his three teeth, that is, that Deputy Rodrigue struck him in the mouth with a billy when he was screaming for help. The testimony shows that he had no bruises or injury on his lips or face other than the eye injury and the three teeth knocked out. Therefore, when he lost his teeth his mouth must have been open as testified to by plaintiff.
Deputy Sheriff Toups testified that he received a scratch on the arm which, to us would be natural if he was beating on the plaintiff as we believe he was, or if the plaintiff was resisting this beating. The defendants testified that plaintiff also struck Rodrigue in the mouth causing it to bleed. There is no corroborating testimony from any disinterested witness *Page 519 
or any of the other witnesses except Toups that Rodrigue received a blow which made his mouth bleed. Evidence of this injury must certainly have still been there and could have been seen by either of the numerous people who saw Rodrigue on this night, especially by the Chief Criminal Deputy in the jail, Lonnie Hargis, Chapman and others, if Rodrigue had shown it to them. Even if he did receive such a blow in the mouth, it must have been a very light one and would not, in our opinion, justify him, any more than the scratch on the arm of Toups would justify Toups in severely beating the plaintiff, as the facts prove was done in this case. The testimony showed that Rodrigue weighed 195 pounds, was an experienced police officer as well as was Deputy Sheriff Toups, and that Toups, as stated above weighed 235 or 240 pounds, while the plaintiff only weighed 151 pounds. There is nothing to show that the plaintiff was an experienced boxer or had any more strength than any ordinary 151 pound man, and we can see no reason why these two deputies could not easily have held this little man and subdued him, even if the plaintiff did resist, rather than to resort to the use of their billys. We believe the defendant deputies used a great deal more force than was necessary to effect this arrest.
Deputy Sheriff Toups testified that he was very much incensed or mad, which is only natural due to the fact that the prowler had peeped in the lighted window in the house occupied by his mother, sister and little niece. This was only natural, but as an official, he had no right to allow his personal feelings to overcome his obligations as a deputy sheriff. Deputy Sheriff Toups should not have been allowed to watch for a prowler at his mother's home as one could anticipate that he would possibly work the prowler over with his billy if he caught him, whether he resisted or did not resist.
Deputy Sheriff Rodrigue was shown by the record to have been quite a frequent user of the billy as means of subduing offenders of the law. In fact, the testimony shows that he used his billy in some instances without rhyme, reason or provocation.
Plaintiff testified that on the way to the jail he asked for a doctor and that Deputy Rodrigue handed his black jack to Lonnie Hargis and said, "If he don't shut up give him another lick on the head." The two deputies and Junior Toups, who were on the front seat emphatically deny this, however, when Lonnie Hargis was placed on the stand he corroborated plaintiff except that he testified he did not get the black jack. The witness Hargis admits sufficient of plaintiff's statement to prove that plaintiff was telling the truth and the other three were not. We do not believe that plaintiff fabricated the conversations which he says took place and which the defendants deny.
The facts prove that plaintiff is shown to have received the injury to his left arm while his arm was up, due to the fact that this injury was underneath the arm and between the shoulder and elbow, which leads us to believe that he was protecting himself by throwing his arm up in front of his face at the time he received this injury.
From a study of this entire record, we are not inclined to believe that this plaintiff fought like a wild man. Had he fought like a wild man he would not have had many clothes left on, and only his shirt was torn and we believe this was done by one of the officers grabbing him on the collar in order to hold him and strike him.
We are of the opinion that it has been proven that these deputy sheriffs violated or failed to perform faithfully a duty required of them by law. The surety is liable as well for a deputy sheriff's violations of an official duty or for a failure to perform such duty faithfully as for the sheriff's violations or failure of faithful performance of an official duty. Sanders v. Humphries et al., 143 La. 43, 78 So. 168. If the deputy sheriff strike a prisoner whom he has in charge when there was no need for it, his conduct in so doing would have been the violation of an official duty, a malfeasance for which the sheriff and his surety would *Page 520 
be liable. Gray v. De Bretton, La. App., 184 So. 390, 391; Bolton v. Severio, La. App., 25 So.2d 115; Brit v. Merrit, La. App., 35 So.2d 281. We are therefore of the opinion that the judgment of the District Court should be reversed and that there should be judgment against the defendants and in favor of the plaintiff.
For these reasons, we believe that plaintiff is entitled to an award of $3,000.00 for the loss of his eye and other minor injuries, pain and suffering, and also to the actual medical expenses proven which total $95.50. We do not believe that the mere estimate for the loss of three teeth out of the upper dental plate has been sufficiently proven, as there is no actual testimony in the record to support this item, and we also feel that the estimate itself is altogether too high.
For these reasons, it is ordered that the judgment of the District Court be reversed and annulled and that accordingly there be judgment in favor of the plaintiff, Ieve Paul Dufrene, and against the defendants, Emile Rodrigue, Emile Toups, Dr. Charles J. Barker, and United States Fidelity and Guaranty Company, insolido, in the full sum of $3,095.50 plus legal interest thereon from the date of judicial demand until paid and the defendants to pay all costs of these proceedings.
DORE, J., dissents, being of the opinion that the judgment of the District Judge is correct and it should be affirmed.