R. C. McCORMICK

v.

Edwin EDWARDS, Individually and as Governor of Louisiana, and Wingate M. White, Individually and as Executive Director of the Louisiana Commission on Law Enforcement & Administration of Criminal Justice.

Civ. A. No. 76–272–A.

United States District Court, M. D. Louisiana.

Sept. 26, 1979.

Elliott W. Atkinson, Jr., Law Offices of Roy A. Maughan, Leo J. Berggreen, Baton Rouge, La., for plaintiff.

William J. Guste, Jr., Atty. Gen. of Louisiana, Thomas F. Wade, Staff Atty., John DiGiulio, Asst. Atty. Gen., Louisiana Dept. of Justice, Baton Rouge, La., for Edwin Edwards and Wingate White.

William H. Cooper, Jr., Mary Olive Pierson, Baton Rouge, La., for Joseph A. Delpit.

Joseph F. Keogh, Walter G. Monsour, Jr., Frank J. Gremillion, Baton Rouge, La., for Woodrow W. Dumas.

E. GORDON WEST, Chief Judge:

Plaintiff, R. C. McCormick, was employed by the State of Louisiana as District Director for the Capital District Law Enforcement Planning Council, which is a part of a federally funded program. His immediate superior was the defendant, Col. Wingate M. White, Executive Director of the Louisiana Commission on Law Enforcement and Administration of Criminal Justice. Col. White had the exclusive authority to hire

and fire persons to hold or holding the position occupied by the plaintiff, but as the evidence clearly showed, as a practical matter, the hiring and/or firing was done only after consultation with and with the consent of or at the direction of the defendant, Edwin W. Edwards, Governor of the State of Louisiana. The other two defendants, Woodrow W. Dumas, Mayor of the City of Baton Rouge, and Joseph A. Delpit, formerly a member of the City-Parish Council of Baton Rouge and later a State Representative, had no authority or power in their official capacity to hire or fire a person holding the position held by the plaintiff.

Plaintiff filed this suit claiming that he had been fired from his job for purely political reasons and that the four named defendants had conspired to bring about his discharge. He alleged that he was neither in a policy-making position nor in a position involving a confidential relationship with a policymaker as defined in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). He alleges that he was discharged for purely political reasons in violation of his First and Fourteenth Amendment rights, and in violation of his civil rights as protected by Title 42, U.S.C. §§ 1981, 1983, 1985, 1986 and 1988. After trial of this case, the Court, for oral reasons assigned and now a part of this record, found that all four defendants did conspire to and were part of a scheme to deprive the plaintiff of his federally protected rights, and indeed did in fact deprive him of those rights, and that therefore plaintiff is entitled to recover damages therefor from the defendants. The Court specifically found that the plaintiff was neither a "policy-maker," nor a "confidential employee" as those terms are used in *Elrod*. See also *Stegmaier, et al v. Trammell, et al*, 597 F.2d 1027 (CA 5–1979)

The matter is now before the Court for a determination of damages.

■ The first question that must be resolved is whether the defendants are liable in their individual capacity or only in their official capacity. As far as W. W. Dumas and Joseph A. Delpit are concerned, there is simply no question but that they are liable

as individuals and not as public officials. Neither of those defendants had any official obligation or duty connected with the hiring or firing of the plaintiff. Whatever their involvement, it was on a deliberately voluntary basis, and in no way connected with any official duties. The evidence in the case left absolutely no doubt whatsoever that the influence exerted by those two defendants on the Governor was purely political and was in furtherance of what had apparently developed as a political feud between those defendants and the plaintiff. Their involvement in the firing of the plaintiff is spelled out in the Court's prior reasons for judgment. Their actions were voluntary, deliberate and purely personal in nature. They were in no way connected with the public weal. Their actions which the Court has previously held played a substantial part in causing the plaintiff to be discharged from his job were unofficial, personal actions taken in violation of plaintiff's federally protected rights, and for which the defendants, W. W. Dumas and Joseph A. Delpit, are personally liable to the plaintiff.

■ We turn now to the question of whether or not Col. White and Governor Edwards are protected by immunity from suit for what they contend were official acts. There is no doubt but that Col. White had the authority, under certain circumstances, to fire the plaintiff, and in all probability the Governor had an official right, under certain circumstances, to fire the plaintiff or cause him to be fired. But the question here is whether or not, under the circumstances of this case, either Col. White or Governor Edwards, or both, acted outside the scope of their authority when they caused the plaintiff to be fired for purely political reasons.

The question of whether or not the defendants acted in their official character is therefore material here for the purpose of determining whether they are shielded from liability for the wrongful acts which they have been found to have committed. Those defendants can be found to be shielded from liability if the acts which have been

proved were committed within the scope of their official duties as provided by State law, and within the boundaries set for such State-granted immunity by the Supreme Court of the United States in the case of *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

The immunity provided by the State of Louisiana for the protection of its officers when acting within the scope of their official duty has always been narrowly interpreted by the Courts of this State. In *Strahan v. Fussell*, 218 La. 682, 50 So.2d 805 (1951), the Louisiana Supreme Court quoted with approval from the earlier case of *Thibodaux v. Town of Thibodaux*, 46 La.Ann. 1528, 16 So. 450, where it said:

> "Officials, in the performance of a duty imposed by law, cannot be held in damages for acts done *strictly* within the lines of official duty." (Emphasis added.)

The Court, in *Strahan*, further said:

> "The defendant is entitled to the immunity from suit of a public official only so long as he acts honestly and in good faith, and within the scope of his authority. If he acts outside of his strict authority, he breaches the condition of his immunity and is liable to a civil action for damages to persons harmed by his improper conduct." (Citations omitted.)

In *Strahan*, the Court held that a member of the Police Jury of Washington Parish was not entitled to immunity where a suit was brought against him for negligent maintenance of a public bridge in his ward, even though maintenance of the public roads was the clear responsibility of the Police Jury, where that body had improperly delegated its authority to its individual members, whose acts and omissions in regard to the maintenance of the roads were thereafter considered to be outside of the scope of their official duty. So hostile, indeed, have the Courts of Louisiana been to the idea that public officials may be immune from liability for performing the same act that would result in an assessment of damages against a private person, that in the area of the immunity of a law enforcement officer, the area naturally most frequently litigated, the immunity has been reduced to an insignificant thing. Professor Ferdinand Stone, in his treatise on Louisiana torts, writes:

> "Where a sheriff lays hands upon and arrests an individual in the course of his duty and with proper warrant, such conduct may well be privileged. But if he exceeds this privilege as was the case in *Dufrene v. Rodrigue*, 38 So.2d 511 (La. App.1949), where the deputy sheriff struck a prisoner under his charge when there was no need for it, the sheriff was held liable for the abuse of his authority. The borderline between necessary and unnecessary force is not always so easy to draw as in the aforementioned case and depends upon the facts of each case." Stone, Louisiana Civil Law Treatise, Tort Doctrine, Section 140.

Public officials are clothed with authority to act in the public interest. To enable them to so act, they are given broad powers, the higher the official, the broader his power. Here, the defendants, Edwards and White, had, under certain circumstances, the power to effect the dismissal of the plaintiff. But it is the judgment of this Court that they had no right to do so for purely personal and political reasons, and in clear violation of the plaintiff's federally protected rights. When they so acted, they acted beyond the scope of their official duty, and in accordance with the law of the State of Louisiana, whose officers they were, they were not protected by any privilege or immunity from suit. We are cognizant of the fact that in *Scheuer v. Rhodes*, supra, the Supreme Court made reference to what it termed a "qualified immunity" available under certain circumstances to officers of the executive branch of government:

> ". . . a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the

existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Scheuer v. Rhodes* at p. 1692. But we hold here that the defendants, White and Edwards, did not act in the good faith belief that they had the right to do what they did, as the term "good faith" has been interpreted by the Supreme Court of the United States, and that therefore, their acts fall outside the limit set upon the power of the states to immunize their officers from personal liability under the Civil Rights Act.

After publication of the decision in the *Scheuer* case, it was somewhat unclear as to whether the qualified immunity therein described covered all acts *subjectively* believed by the official to be proper or whether an *objective* standard was meant to apply. The Supreme Court clarified this issue in the later case of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In that case the Court said:

"The disagreement between the Court of Appeals and the District Court over the immunity standard in this case has been put in terms of an 'objective' versus a 'subjective' test of good faith. As we see it, the appropriate standard necessarily contains elements of both. The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member, who has voluntarily undertaken the task of supervising the operation of the school and the activities of the students, must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, un-questioned constitutional rights of his charges. Such a standard imposes neither an unfair burden upon a person assuming a responsible public office requiring a high degree of intelligence and judgment for the proper fulfillment of its duties, nor an unwarranted burden in light of the value which civil rights have in our legal system. Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student. That is not to say that school board members are 'charged with predicting the future course of constitutional law.' *Pierson v. Ray*, 386 U.S., [547] at 557, 87 S.Ct., [1213] at 1219 [18 L.Ed.2d 288]. A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." *Strickland*, at pp. 1000–1001.

The defendants claim that at the time they effected the discharge of the plaintiff, they believed they had the authority to do it, and that they believed, in good faith, that the *Elrod* prohibitions did not apply in this particular case. The test laid down in *Wood v. Strickland*, supra, has been again discussed by the Supreme Court in the recent case of *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), involving the scope of immunity of California State Prison officials accused of wrongful interference with a prisoner's outgoing mail. There it was held that the defendants were entitled to immunity because there was no clear cut established right protecting prisoner correspondence at the time the acts were alleged to have occurred.

"Whether the state of the law is evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court, there was no 'clearly established' First and Fourteenth Amendment right with respect to the correspondence of convicted prisoners in 1971–1972. As a matter of law, therefore, there was no basis for rejecting the immunity defense on the ground that petitioners knew or should have known that their alleged conduct violated a constitutional right. Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for the established law that their conduct 'cannot reasonably be characterized as in good faith.' *Wood v. Strickland,* supra, 420 U.S., at 322, 95 S.Ct., at 1001." *Procunier v. Navarette,* supra, at 861–862.

■ As the Court conceives its duty in this case, therefore, we must determine whether the defendants, White and Edwards, could have believed in good faith that they were acting within the law when they brought about the discharge from employment of the plaintiff. In making our determination of good faith, or lack thereof, we cannot allow the defendants to rest upon their purely subjective impressions and to plead ignorance of clearly established constitutional rights. The defendants contend that since the case of *Elrod v. Burns,* supra, which established the right of officials to dismiss policymaking or confidential government employees for purely political reasons, was not decided until one month after the events giving rise to this suit, that therefore the defendants cannot be held to know that their contemplated act was legally wrongful. Their argument is two-fold. They say that:

1. Prior to *Elrod* it would have been reasonable to believe that any government employee could be dismissed for purely political reasons.

2. Since *Elrod,* it is not absolutely clear that one occupying a position such as Mr. McCormick's could not be found

to come within the exception permitting political dismissals of policymakers.

Each of these contentions must be rejected.

The *Elrod* case did not establish a brand new prohibition in the law against depriving people of their jobs for purely political reasons. The case was most remarkable for the exception it created, permitting the dismissal of a very narrowly defined class of persons for otherwise impermissible reasons. Strong language in numerous cases decided *before Elrod* indicated that conditions relating to political affiliation or belief could never be placed upon public employment. The defendants must be charged with knowledge of those well established principles. The marshalling of cases by the *Elrod* court itself best illustrates this fact. The principles contained in the cases cited in *Elrod,* dating as far back as 1943, clearly show the illegality of the acts with which the defendants herein are charged, and they clearly establish that those principles have been established for a long time. The *Elrod* Court, in marshalling supporting, well established principles, and citing cases in support thereof, said:

" . . . political belief and association constitute the core of those activities protected by the First Amendment. Regardless of the nature of the inducement, whether it be by the denial of public employment or, as in *Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), by the influence of a teacher over students, '[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.' *Id.,* 319 U.S., at 642, 63 S.Ct., at 1187. And, though freedom of belief is central, '[t]he First Amendment protects political association as well as political expression.' *Buckley v. Valeo,* supra, 424 U.S. [1] at 11, 96 S.Ct. [612] at 632 [,46 L.Ed.2d 659]. 'There can no longer be any doubt that freedom to associate with others for the

common advancement of political beliefs and ideas is a form of "orderly group activity" protected by the First and Fourteenth Amendments. *NAACP v. Button*, 371 U.S. 415, 430, 83 S.Ct. 328, 336, 9 L.Ed.2d 405; *Bates v. Little Rock*, 361 U.S. 516, 522–523, 80 S.Ct. 412, 416–417, 4 L.Ed.2d 480; *NAACP v. Alabama*, 357 U.S. 449, 460–461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488. The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom.' *Kusper v. Pontikes*, 414 U.S. 51, 56–57, 94 S.Ct. 303, 307, 38 L.Ed.2d 260 (1973).

"Particularly pertinent to the constitutionality of the practice of patronage dismissals are *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In *Keyishian*, the Court invalidated New York statutes barring employment merely on the basis of membership in 'subversive' organizations. *Keyishian* squarely held that political association alone could not, consistently with the First Amendment, constitute an adequate ground for denying public employment. In *Perry*, the Court broadly rejected the validity of limitations on First Amendment rights as a condition to the receipt of a governmental benefit, stating that the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' *Speiser v. Randall*, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible. 408 U.S., at 597, 92 S.Ct. at 2697.

"Patronage practice falls squarely within the prohibitions of *Keyishian* and *Perry*. Under that practice, public employees hold their jobs on the condition that they provide, in some acceptable manner, support for the favored political party. The threat of dismissal for failure to provide that support unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise. The belief and association which government may not ordain directly are achieved by indirection. And regardless of how evenhandedly these restraints may operate in the long run, after political office has changed hands several times, protected interests are still infringed and thus the violation remains." *Elrod v. Burns*, 96 S.Ct. 2673 (1976), at 2181–3.

As long ago as 1969, the Court of Appeals of our own Fifth Circuit said that the contention that there was no right to public employment which would support an action for wrongful deprivation of the same "has for over a decade been rejected time and time again." *Pred v. Board of Public Instruc. of Dade County*, 415 F.2d 851 (CA 5–1969), citing *Keyishian*, above, and numerous other decisions. We therefore hold that the right not to be discriminated against in public employment on the basis of the exercise of the first amendment rights of freedom of speech and freedom of association has been clearly established in this Circuit for at least twenty years, precluding any claim of good faith on the part of the defendants based on ignorance of that right.

Furthermore, if there be any doubt of the clarity of the constitutional pronouncements on this subject, there can be little doubt of the clarity of Louisiana's statutory provision:

No . . . employer shall adopt or enforce any rule, regulation, or policy which will control, direct, or tend to control or direct the political activities or affiliations of his employees, nor coerce or influence, or attempt to coerce or influence any of his employees by means of threats of discharge or of loss of employment in case such employees should support or become affiliated with any partic-

ular political faction or organization, or participate in political activities of any nature or character. *L.S.A.–R.S. 23:961* Since neither of the parties to this suit has argued the applicability of this statute and since no court has apparently ever cited or construed it since its passage in 1938, we are reluctant to hold that it would have supported a state suit for the same damages here granted, but its existence seems to us the last nail in the coffin of the defendants' claim of good faith belief in the lawfulness of their acts.

■ We now turn to the argument that the defendants could have believed, in good faith, that the position occupied by the plaintiff was subject to patronage dismissal under the *Elrod* test. Initially, it weighs against this argument that the Court has found it was not. Reasonable men might differ with the Court, but what weighs most heavily against the argument here proffered is the narrowness of the exception drawn by the *Elrod* case. " . . . the burden of establishing this justification as to any particular respondent will rest on the petitioners on remand, cases of doubt being resolved in favor of the particular respondent." *Elrod* at p. 2687. It therefore rests with one who would dismiss another from his public job for political reasons, to demonstrate that the affected job is one involving policymaking or a confidential relationship beyond doubt. That, the defendants in this case clearly failed to do.

To state our holding briefly, we find that the defendants, Edwards and White, are personally liable for the wrongful act they committed when they discharged the plaintiff from his employment, or caused him to be discharged from his employment, and that they may not claim the shield of official immunity, both because, under the circumstances of this case, the act proved lay outside the scope of their official duty, and because they cannot have been in constitutional good faith in believing that they had a right to do that act.

Since we have concluded that the plaintiff is entitled to recover damages for improper termination of his employment, and that all four defendants are individually and collectively liable therefor, we must now address the question of quantum.

■ Plaintiff has shown that at the time of his discharge he was earning $1,475.00 per month. His successor in office has received several pay increases, which we assume, and there being no evidence to the contrary, plaintiff would also have received had he retained the position. We find that the plaintiff's lost wages amount to $62,-975.00, as a direct result of his illegal termination. The evidence shows that since his termination the plaintiff has earned the sum of $34,262.00 in other employment. This amount must be subtracted from the amount of earnings lost as a result of the termination, leaving a net loss of earnings of $28,713.00.

Plaintiff is a family man, with a good reputation in his community, and who, because of the violation of his constitutional rights, was left suddenly without income to meet his obligations. He had to search for a new job, and had to live for the three years during which this litigation has been pending, on a substantially reduced income. This has been attended with all the usual anxieties about how to pay bills, along with the embarrassment that goes with a public dismissal. Calculation of the exact amount of such damages is necessarily unscientific and inexact, but we think that $20,000.00 is not excessive under the circumstances of this case. See *Baskin v. Parker*, 602 F.2d 1205, 1209 (CA 5–1979).

■ Plaintiff also seeks to recover attorney fees involved in this litigation. The two attorneys for the plaintiff aver that they have spent nearly 600 hours working on this case. They make no more precise estimation than that, nor do they offer any breakdown of the time spent by each attorney or of the time spent on each phase or aspect of the case. They ask an award of $30,000.00, which would amount to $50.00 per hour for 600 hours. The Court notes that the record in this case is not voluminous. Approximately 55 documents were filed. Three depositions were taken, at a

total expenditure of time of approximately 10 hours. The trial took less than 2 full days, so that an estimation of 32 hours trial time for both attorneys together is, we believe, very liberal. There was very little discovery involved, and most of the facts upon which liability was ultimately found were admitted by the defendants from the beginning. Primarily it was questions of law that were in dispute, and the law necessary to a decision was largely contained in the *Elrod* case which has been discussed hereinabove, in which the Supreme Court analyzed and practically laid to rest the main points at issue in this case. It is difficult for the Court to believe that two competent attorneys could have labored full time for nearly two months on this case. The law providing for computation of attorney fees in this case is laid down in *Rainey v. Jackson State College*, 551 F.2d 672 (CA 5–1977) as follows. Relevant considerations are:

1. the time and labor required,
2. the skill requisite to properly perform the legal services,
3. preclusion of other employment by the attorneys due to acceptance of the case,
4. the novelty and difficulty of the questions presented,
5. the customary fee,
6. whether the fee is fixed or contingent,
7. time limitations imposed by the client,
8. the amount involved and the results obtained,
9. the experience, reputation and ability of the attorneys,
10. the undesirability of the case,
11. the nature and length of the professional relationship with the client,
12. awards in similar cases.

The only one of the above considerations which would merit a higher than usual fee in this case is No. 10. Undoubtedly many attorneys would hesitate to take a case against such influential public officials as the State Governor, a Mayor, and a State Legislator. See *Rainey, supra,* at p. 677. For this reason, and noting our doubts about the total time actually spent, of necessity, by the attorneys involved, we think that an award of $15,000.00 in attorney fees would be fair and proper in this case. This will compensate the two attorneys, combined, at a rate of $50.00 per hour, which is a reasonable, going rate for a total time of 300 hours. While this figure is necessarily arbitrary, it is the opinion of this Court that it represents a fair fee for the work involved in this case and the results obtained.

■ Lastly, plaintiff seeks a judgment which would, at a future date, reinstate him in his prior job. He prays for what he terms "prospective reinstatement." Since he is presently engaged full time in running for the elective office of Sheriff of the Parish of East Baton Rouge, he requests that he be reinstated effective at the conclusion of the sheriff's race. He apparently anticipates losing the race. Such a remedy is completely unwarranted. Had the plaintiff been unmolested in his job, it would have been necessary for him to resign in order to run full time for the position of sheriff. Had he done so, he most likely would have been replaced during his absence. Whether or not he would have been reinstated in his job if he lost the race for sheriff is entirely too speculative to form the basis of a claim for reinstatement. His claim for that relief must be denied.

We therefore find that the plaintiff suffered damages in the total sum of $63,713.00, including attorney fees, as a result of his unlawful termination from employment, and that the four named defendants, W. W. Dumas, Edwin W. Edwards, Wingate M. White, and Joseph A. Delpit, individually and in solido, are liable to the plaintiff for that amount, together with interest and costs as provided by law. Judgment will be entered accordingly.