Robert J. VISSER, Plaintiff,

v.

Armand MAGNARELLI, James C. Tormey, Jr., Joseph A. Nicoletti, Bernard J. Mahoney, John A. DeFrancisco, Walter J. Ludovico, Edward S. Nowakowski, James T. Walsh, James P. McCarthy, Nancy Larraine Hoffmann, individually and collectively as constituting the Common Council of the City of Syracuse, New York, and Joseph Falge, Defendants.*

No. 81–CV–1404.

United States District Court, N. D. New York.

Jan. 19, 1982.

* The new composition of the Syracuse Common Council as of January 1, 1982, explains the difference between the caption above and the title as originally filed. Defendant John A. DeFrancisco assumed former defendant Sidney L. Johnson's seat, and Armand Magnarelli assumed the position of Common Council president. Both sides have agreed to drop Johnson as a defendant.

McCrone & Davis, Syracuse, N. Y., for plaintiff; Jeffrey M. McCrone, Syracuse, N. Y., of counsel.

David M. Garber, Corp. Counsel, Syracuse, N. Y., for defendants-councilors; Anthony S. Bottar, Eleanor Theodore, Syracuse, N. Y., of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Chief Judge.

Plaintiff commenced this action for injunctive and monetary relief to protect his position as City Clerk of the City of Syracuse, New York. Visser, a Democrat, claims that the Republican majority on the Syracuse Common Council is trying to replace him solely for political reasons, in violation of his First Amendment rights of freedom of belief and association. From the evidence presented and the principles of *Elrod v. Burns*[1] and *Branti v. Finkel*,[2] the Court reluctantly concludes that defendants-councilors must be enjoined from dismissing or failing to reelect plaintiff solely on the grounds of his political affiliations.

### I.

Plaintiff Robert Visser was chosen as deputy City Clerk in January, 1974, by the then-City Clerk, Mortimer Gallivan.[3] In September, 1980, the Common Council elected Visser to replace Gallivan as City Clerk upon the latter's resignation. In the

1. 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

2. 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

3. Plaintiff's Exh. 3, Proceedings of the Common Council of the City of Syracuse For the Fiscal Year 1981, at 4.

November, 1980 elections, the Republican Party regained control of the Common Council by one vote. Republican legislators considered firing Visser at that time, but held off on advice of counsel. Their renewed attempts to replace plaintiff with a Republican City Clerk in late December, 1981, precipitated this action.

Plaintiff filed his complaint on December 31, 1981.[4] By order to show cause, he sought a temporary restraining order and a preliminary injunction enjoining defendants from taking any action to terminate or replace him as City Clerk and from attempting to alter his employment status. Plaintiff specifically sought to enjoin the Common Council from voting for a new City Clerk at its January 2, 1982 organizational meeting. This Court signed a modified temporary restraining order, allowing the Common Council to hold an election for City Clerk, but enjoining defendants from declaring the position vacant and from installing any person other than plaintiff as City Clerk, and ordering Visser to be retained in his job pending this opinion.[5]

At its January 2 meeting, defendant Joseph Falge, a Republican, was nominated and elected as City Clerk. The vote split down party lines, with the five Republicans supporting Falge and the four Democrats opposing him. Pursuant to the temporary restraining order, however, Falge has not been sworn into office.

On January 8, 1982, the Court held an evidentiary hearing. Pursuant to Fed.R. Civ.P. 65(a)(2), and upon the consent of the parties, the plenary trial was advanced and consolidated with the preliminary injunction hearing as to the issue of liability. The issues of immunity and damages are to be determined later.[6] On January 11, this Court issued a Judgment-Order in favor of plaintiff. This Memorandum-Decision and Order explains the Judgment-Order and constitutes the Court's findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

## II.

Section 3–113 of the Syracuse City Charter describes the City Clerk's general duties:

> (1) The Council shall choose a clerk. He shall be the City Clerk and shall attend the meetings of the Council, keep a journal of its proceedings and discharge such other duties as may be prescribed by ordinance. The City Clerk shall transmit to the head of each office, department or board, copies of all ordinances in any matter affecting any of the matters of which any such office, department or board shall have jurisdiction. He shall have custody of the City seal.
>
> (2) The clerk shall keep each ordinance passed in a book provided for that purpose. He shall give notice in writing to each officer of his election or appointment and of the amount of his official bond or undertaking, if any. He shall cause to be published all notices, advertising matters or proceedings as required by the provisions of this Charter or by law or ordinance.[7]

In addition, plaintiff testified that he prepares the agenda for Common Council meetings, based on requests for legislation

---

**4.** Jurisdiction was based on 42 U.S.C. § 1983 (1976 & Supp. III 1979) and 28 U.S.C. § 1343(a)(3) (1976 & Supp. III 1979).

**5.** *Cf: Brady v. Paterson*, No. 81–CV–431, (N.D. N.Y. July 15, 1981). There, Judge McCurn granted a temporary restraining order to protect plaintiff in his job as New York State Director of the Division of Cemetaries pending a hearing on his claim that defendants refused to rehire him solely because of his political affiliations. On July 15, 1981, the District Court issued a Memorandum-Decision and Order dissolving the temporary restraining order and denying plaintiff's motion for a preliminary injunction. The next day, before Brady had yet moved for a stay pending appeal, defendant Paterson appointed a replacement. Because of that event, the Second Circuit dismissed the appeal as moot in an unpublished order. The format of the temporary restraining order here was designed to avoid that possible pitfall.

**6.** *See, e.g., McCormick v. Edwards*, 479 F.Supp. 295, 297 (M.D.La.1979), *rev'd on other grounds*, 646 F.2d 173 (5th Cir. 1981), following the same procedure.

**7.** Charter of the City of Syracuse, New York— 1960 [Charter], § 3–113.

submitted to him by councilors. He automatically includes proposed resolutions on the agenda unless another councilor objects. He also prepares the agenda for Board of Estimate meetings, and keeps a journal of its proceedings.[8] As with Common Council agenda preparation, the City Clerk lacks any discretion to decide the agenda's contents; department head requests are automatically included as topics for discussion. The City Clerk also administers the issuance of hunting, fishing, marriage and dog licenses. Finally, the City Clerk has the authority to hire and fire the deputy clerk.

### III.

The Court identified five issues to be resolved in this case: 1) whether plaintiff's term as City Clerk is indefinite or for a fixed two year period; 2) whether *Elrod* and *Branti* apply to a "refusal to rehire" case; 3) whether plaintiff has met his threshold burden to prove that his political affiliation was a substantial or motivating factor in defendants-councilors' decision not to rehire him; 4) whether *Branti's* "policy-making" exception applies here; and 5) whether defendants' "lack of intent" defense precludes this action.

The first issue involves the City Clerk's length of term. Resolution of that question in turn determines the characterization of this case. Plaintiff argues from the city charter's silence on the subject[9] that his term is indefinite. If so, defendants-councilors are attempting to dismiss plaintiff, and their activities clearly fall within the *Elrod* and *Branti* fact patterns.[10] Con- versely, the Republican defendants-councilors urge that a long standing custom of electing or reelecting a city clerk at the Council's organizational meeting, held every two years, effectively creates a two year term. Under this interpretation, plaintiff's position expired midnight, December 31, 1981. The Council's election of defendant Falge on January 2 as the new City Clerk would then place plaintiff's complaint in the category of "failure to reelect" cases, which the Supreme Court has not directly addressed. For the reasons below, the Court agrees with defendants on this issue.

The tradition of electing a City Clerk every two years at the Common Council's first meeting of its term is long and unwavering. The minutes of every organizational meeting held under the old city charter specifically delimited the City Clerk's term as being two years.[11] Despite the current city charter's silence on the topic, the Common Council has consistently continued to elect or reelect a City Clerk every two years.[12]

Moreover, the minutes of the September 29, 1980 Common Council meeting, at which plaintiff was elected City Clerk, state that he was elected to serve out the previous clerk's unexpired term. The oath of office signed by Visser states that his term expires December 31, 1981.[13] Visser's acquiescence in this longstanding custom may preclude his attack on its validity.[14] Courts generally follow the interpretation placed on local laws by municipal officers;[15] no

---

8. Charter, *supra* note 7, § 5–302(4).

9. *See* text accompanying note 7 *supra*.

10. In both cases, "the only practice at issue was the *dismissal* of public employees for partisan reasons." *Branti, supra,* 445 U.S. at 513 n. 7, 100 S.Ct. at 1292 n.7 (emphasis added) (citing *Elrod, supra,* 427 U.S. at 353, 96 S.Ct. at 2679).

11. Defendants' Exh. E.

12. Defendants' Exh. F.

13. Defendants' Exh. D.

14. *See, e.g., Rochester Savings Bank v. Monroe County,* 169 Misc. 526, 532, 8 N.Y.S.2d 107, 113

(Sup.Ct.1938); 13 N.Y.Jur. *Customs & Usages* §§ 14, 26 (1960). *But cf. Branti, supra,* 445 U.S. at 512 n.6, 100 S.Ct. at 1291 n.6 (rejecting a similar waiver argument where constitutional rights are involved) (citing *Elrod, supra,* 427 U.S. at 360 n.13, 96 S.Ct. at 2683 n. 13).

15. *In re Green v. Miller,* 249 N.Y. 88, 94, 162 N.E. 593, 596, (1928); *City of New York v. New York City Railroad Co.,* 193 N.Y. 543, 549, 86 N.E. 565, 567 (1908); *Trustees of the Town of Southhampton v. Mecox Bay Oyster Co.,* 116 N.Y. 1, 16, 22 N.E. 387, 392 (1889).

N. Y. Second Class Cities Law § 32 (McKinney) provides additional support for a fixed term. The section provides that "[t]he common council shall choose a clerk to hold office

## IV.

The principles of *Elrod* and *Branti* apply to the facts presented here. Judge McCurn's decision in *Brady v. Paterson*, 515 F.Supp. 695 (N.D.N.Y.1981), is the most recent decision on the failure to reappoint. That opinion reviewed law review commentary and earlier cases on the issue, and held that the failure to reappoint solely for political reasons is on a par constitutionally with patronage dismissal practices. The Court finds *Brady's* reasoning persuasive, and incorporates by reference its analysis into this opinion. I only add additional support.

As in *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), discussed in *Brady, supra*, 515 F.Supp. at 699, the Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977), held that a non-tenured teacher may establish a claim to reinstatement if the school board's decision not to rehire him "was made by reason of his exercise of constitutionally protected First Amendment freedoms." (citing *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). In *Tanner v. McCall*, 625 F.2d 1183, 1189–95 (5th Cir. 1980), the Fifth Circuit assumed the applicability of *Elrod* and *Branti* to failure to reappoint cases, but concluded that plaintiffs failed to meet their burden of proving that political discrimination was a substantial or motivating factor in defendants' employment decisions. Finally, in *DeLong v. United States*, 621 F.2d 618, 623 (4th Cir. 1980), the Fourth Circuit, citing earlier case law, held that "the *Elrod-Branti* principle must be construed to provide protection against a wider range of patronage burdens than threatened or actual dismissals." The court remanded for fact-finding on whether plaintiff's transfer and reassignment fell within the scope of *Branti* and *Elrod. Id.*[16]

during the term for which its members were elected." Under the current charter, Common Council terms are for two or four years. Charter, *supra* note 7, § 3–101(2). Before the Home Rule Amendments were passed, *see* N.Y.Const. art. 9, § 2, the Second Class Cities Law constituted the charter of Syracuse. *House v. Bodour*, 168 Misc. 766, 767, 768, 7 N.Y.S.2d 443, 445 (Mun.Ct.1938). Though now more or less obsolete, the Second Class Cities Law still functions for certain purposes, such as here, to fill gaps in individual charters. *Ponsrok v. City of Yonkers*, 254 N.Y. 91, 93, 171 N.E. 917, 918 (1930); *In re Grenfell*, 269 A.D. 600, 603–604, 58 N.Y.S.2d 501, 504 (3d Dep't), *aff'd per curiam*, 294 N.Y. 610, 63 N.E.2d 593 (1945).

Moreover, to conclude that no fixed term exists for the position of City Clerk would not alter the analysis. A determination that plaintiff serves at the pleasure of Common Council would be irrelevant for purposes of deciding the constitutional issue presented. *See Branti, supra*, 445 U.S. at 512 n. 6, 100 S.Ct. at 1291 n.6; *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972).

**16.** The district court subsequently found in favor of plaintiff. *DeLong v. United States*, No. 78–294 (E.D.Va. Sept. 18, 1980).

The Court also notes that *Branti* itself may be interpreted as rejecting a different standard for failure to reappoint cases:

> ... petitioner argues that we should treat this case as involving a "failure to reappoint" rather than a dismissal and, as a result, should apply a less stringent standard. Petitioner argues that because respondents knew the system was a patronage system when they were hired, they did not have a reasonable expectation of being rehired when control of the office shifted to the Democratic party. A similar waiver argument was rejected in *Elrod v. Burns*, 427 U.S. 347, 360, n. 13, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547; *see also* 427 U.S., at 380, 96 S.Ct., at 2692 (Powell, J., dissenting). After *Elrod*, it is clear that the lack of a reasonable expectation of continued employment is not sufficient to justify a dismissal based solely on an employee's private political beliefs.

445 U.S. at 512 n. 6, 100 S.Ct. at 1291 n. 6.

As a fallback position, defendants urge the Court to exempt local legislators' action from the extension of *Elrod* and *Branti* adopted above. To allow challenges such as plaintiff's, contend defendants, would unduly interfere with the legislative process by making it more difficult to fill vacancies in office.

That argument raises essentially the same policy issues addressed in *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980). Defendants-councilors may be immune from personal liability, but an action against the Common Council as an entity surely lies. *Id.* at 657, 100 S.Ct. at 1419. Legislators are not per se exempt from the Constitution.

The Supreme Court has constructed a balancing test in patronage cases, weighing the

## V.

The Court turns now to the requirements of proving a claim under *Elrod* and *Branti.* Plaintiff carries the initial burden to show that his membership in the Democratic party was a "substantial" or "motivating" factor in the Common Council's decision not to rehire him. *Mt. Healthy, supra,* 429 U.S. at 287, 97 S.Ct. at 576. Once past that hurdle, the burden shifts to defendants to prove by a preponderance of the evidence that (an)other reason(s) existed for their failure to rehire Visser. *Id.*[17]

Republican attempts to oust Visser began in late 1980.[18] In the November, 1980 elections, the Republican Party recaptured control of the Common Council. On December 14, 1980, defendant Walsh wrote Visser:

Dear Bob,

This is perhaps the most difficult letter I have ever had to write. My first official duty as Republican majority leader is to inform you that we will be electing a new City Clerk at the organizational meeting on January 2, 1981.

I want you to know that we all value the high caliber of your work as Deputy Clerk and City Clerk. Your dedication to the job has been exemplary. However, as you know the Clerk serves at the discretion of the Council and we felt that a change was necessary to reflect the change in the Council. All I can tell you is that we will attempt to find someone who can measure up to your performance.

Sincerely,

Jim Walsh [19]

---

employee's First Amendment right of freedom of political association against the futherance of vital state interests. *Elrod, supra,* 427 U.S. at 363, 96 S.Ct. at 2685. Under this test, courts must focus on the nature of the claimed interest, not the actors involved. A personnel decision is not to be deemed to withstand constitutional scrutiny simply because it is made by a local legislative body.

Finally, in two cases brought by city attorneys against their common councils, the courts assumed the applicability of *Elrod* and *Branti,* but concluded that the plaintiffs fell within the policymaking exception to the general proscription on patronage practices. *Ness v. Marshall,* 660 F.2d 517 (3d Cir. 1981); *Bavoso v. Harding,* 507 F.Supp. 313 (S.D.N.Y.1980).

**17.** The Court rejects defendants' argument that plaintiff must meet the much more rigorous standard of carrying the burden of persuasion to show that politics is the *sole* reason for his failure to be rehired. *Nekolny v. Painter,* 653 F.2d 1164, 1167–68 (7th Cir. 1981); *Tanner v. McCall,* 625 F.2d 1183, 1192, 1195 (5th Cir. 1980); *cert. denied,* 451 U.S. 907, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981); *see also Layden v. Costello,* 517 F.Supp. 860, 862 (N.D.N.Y.1981).

**18.** Defendants complain that the events of a year ago are not relevant to plaintiff's action for the following reasons: 1) the present Common Council is a different political entity, because a new term started in 1982; 2) one defendant-councilor, John DeFrancisco, was not a Common Council member a year ago; and 3) because the discussion at the January 5, 1981 Common Council meeting did not culminate in a vote, the Court cannot know how individual members would have voted. The Court agrees that past acts "cannot, in the manner of original sin, condemn governmental action that is

not itself unlawful." *City of Mobile v. Bolden,* 446 U.S. 55, 74, 100 S.Ct. 1490, 1503, 64 L.Ed.2d 47 (1980). For that reason, evidence of the long tradition of the Common Council's electing a city clerk with the same political affiliations as the majority of Council members is irrelevant in determining the motives of current members. *See, e.g., Tanner, supra,* 625 F.2d at 1193 n. 17. The Court finds, however, last year's events to be relevant and material to this year's acts. Under Fed.R.Ev. 404(b), evidence of past acts is admissible to prove, *inter alia,* opportunity, intent or knowledge. The admissibility of such evidence is within the court's sound discretion. *United States v. Nolan,* 551 F.2d 266, 271 (10th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 302, 54 L.Ed.2d 191 (1977). In inferring intent today, evidence of the Council's or individual councilors' intent in early 1981 under the same circumstances is certainly relevant, even though the one year time lag attenuates its probative value slightly. With the exception of defendant-councilor DeFrancisco replacing Sidney Johnson, the actors of a year ago are the same as those today. The January 5, 1981 Common Council meeting sets the context for the events surrounding Falge's election in January, 1982. *See* Plaintiff's Exh. 3, *supra* note 3, at 3–5 (defendant-councilor Tormey, a Republican, asking the Corporation Counsel whether the Republican majority could replace Visser in 1982, after his term expired and the position became vacant). *See generally United States v. Pry,* 625 F.2d 689, 692 (5th Cir. 1980), *cert. denied,* 450 U.S. 925, 101 S.Ct. 1379, 67 L.Ed.2d 355 (1981); *United States v. Barbieri,* 614 F.2d 715, 719 (10th Cir. 1980); *United States v. Barnes,* 586 F.2d 1052, 1057 (5th Cir. 1978).

**19.** Plaintiff's Exh. 2.

Later that month, Walsh and defendant Mahoney, a fellow Republican, visited Visser in his office. Plaintiff testified that the substance of the conversation paralleled Walsh's letter.

The controversy rose to a boil at Common Council's first meeting of January, 1981. Defendant-councilor Walsh moved to nominate defendant Falge as City Clerk.[20] Defendant Magnarelli, Common Council President and a Democrat, ruled the Republicans could not elect a new clerk until Visser's term expired.[21] The Republicans attacked Magnarelli's ruling; defendant Tormey proclaimed that the new majority had the right to select a new City Clerk, with or without a vacancy.[22] Defendant-councilor Nicoletti, a Democrat, charged the Republicans with attempting to fire Visser "for purely political reasons."[23] Democrats and Republicans alike agreed that Visser was doing a good job.[24] Asked for a legal opinion on the motion, Corporation Counsel David Garber ruled that the Council's discussion made it clear that Visser was being dismissed solely on the basis of his political affiliation, and that the Council could not dismiss him for that reason.[25] Defendant Walsh disagreed with Garber's conclusion, but reluctantly decided to table his motion without vote.[26]

The events of December, 1981 and January, 1982 provide sufficient circumstantial evidence by themselves to show that politics infused the failure to rehire. Visser testified that on December 30, 1981, defendant-councilor Mahoney visited him alone in plaintiff's office. In a brief closed door conversation, Mahoney told Visser that Visser would hear some things in the next few days that he wouldn't like; that he admired plaintiff's abilities; that what was about to happen was only political, not personal; and that Visser would understand "how these

things work." According to plaintiff, Mahoney also told him that he would deny the conversation. Visser's testimony on this point is uncontroverted. This testimony shows that plaintiff's political beliefs motivated at least defendant-councilor Mahoney's decision.

As additional factors, the Court notes that in the discussion surrounding defendant Falge's election at the January 2, 1982 meeting, no one complained that plaintiff's job performance was inadequate. The Court may also draw a logical inference from the makeup of the vote to elect Falge. The five Republicans voted for Falge; the four Democrats opposed his election. Finally, defendant DeFrancisco admitted that the Republican members of the Council discussed the position of City Clerk at a caucus before the January 2 meeting, further suggesting a unified party front. In sum, the evidence clearly shows that political considerations in general, and specifically plaintiff's political affiliation, played a substantial or motivating role in the decision not to rehire Visser.

## VI.

Defendants-councilors have failed their burden to show any other reasons for their refusal to rehire plaintiff. Defendants made no attempt at trial to present a single apolitical justification for their actions. Cf. *Elrod, supra,* 427 U.S. at 366, 96 S.Ct. at 2686 ("employees may always be discharged for good cause, such as insubordination or poor job performance, when those bases in fact exist."). Indeed, the record is replete with references to Visser's good work. On the Republican side, Walsh hailed plaintiff's exemplary dedication to the job in his December, 1980 letter.[27] Councilor Mahoney admitted that "he would be among the first

20. Plaintiff's Exh. 3, *supra* note 3, at 3.

21. *Id.*

22. *Id.*

23. *Id.* at 4.

24. *Id.*

25. *Id.* at 4–5.

26. *Id.* at 5, 22 (Jan. 6, 1981 special meeting).

27. *See* text accompanying note 19 *supra.*

to say that he [plaintiff] had done a good job and no one was saying anything to the contrary. He said Mr. Visser had done a fine job and no one was questioning his character or ability."[28] Democratic councilor Nicoletti praised Visser's "outstanding job" as Deputy City Clerk and City Clerk, adding that he felt plaintiff "had served both parties extremely well."[29] Another Democrat, Councilor Hoffmann, called Visser a "professional," and said that replacing him would be "a darn shame, a disgrace."[30] Instead, defendants hinge their defense on the "policymaking"[31] exception to the Elrod-Branti principles.

The *Elrod* Court found two categories of employees exempt from its proscription of patronage firings: "policymaking" and "confidential" employees. 427 U.S. at 367, 375, 96 S.Ct. at 2687, 2690. The plurality recognized that no clear line could be drawn between policymaking and nonpolicymaking positions, and emphasized the importance of examining "the nature of the [employee's] responsibilities." *Id.* at 367, 96 S.Ct. at 2687.

*Branti* modified the *Elrod* test: "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U.S. at 518, 100 S.Ct. at 1295. *Branti's* language narrows the range of employees exempt from political discharges. For example, the assistant public defenders in *Branti* could have been

labelled "confidential" under the *Elrod* concurrence because of their ability to gain the public defender's trust. *Branti, supra*, 445 U.S. at 521, 100 S.Ct. at 1296 (Stewart J., dissenting). The majority, however, refused to uphold the assistants' political dismissals. *Id.* at 519, 100 S.Ct. at 1295.[32]

Defendants do not seriously contest the nondiscretionary nature of plaintiff's functions described above.[33] Those duties place only narrow technical responsibilities on plaintiff, for which political affiliation has no relevance whatsoever. Were this the extent of the City Clerk's job, the principles of *Branti* and *Elrod* would clearly prohibit his non-rehiring. Defendants claim, however, that the City Clerk has one additional power, unknown to plaintiff until defendants pointed out its existence at trial, for which political belief becomes crucial. Section 31(1)(h) of N.Y. Public Officers Law instructs city officials to tender their resignations to the City Clerk. Section 31(4) reads in relevant part: "A resignation delivered or filed pursuant to this section, . . . may not be withdrawn, . . . except by consent of the officer to whom it is delivered or body with which it is filed." Defendants cite an instance from 1979 to exemplify the political power the City Clerk supposedly possesses.

. At Common Council's November 26, 1979 meeting, Councilor Ross, a Democrat, tendered her resignation, converting the Democrat's previous 5–4 control of the body into a 4–4 tie.[34] Later at the same meeting, Democratic Councilor Magnarelli was elected Common Council president.[35] His vacant

---

**28.** Plaintiff's Exh. 3, *supra* note 3, at 4.

**29.** *Id.*

**30.** *Id.*

**31.** The Court uses this phrase reluctantly, noting both the general tendency of labels to short-circuit reasoned analysis and the Supreme Court's specific admonition against determining "whether the label 'policymaker' or 'confidential' fits a particular position." *Branti, supra*, 445 U.S. at 518, 100 S.Ct. at 1295. The Court uses the phrase only to encapsulate in one word the abstruse *Branti* test, over 20 words long. *Id.*

**32.** *See also* Note, *First Amendment Protects Public Employees' Political Beliefs*, 55 Tul.L. Rev. 576, 582 (1981); Note, *Increased Limitations on Patronage Practices: Branti v. Finkel*, 35 Sw.L.J. 675, 684 (1981).

**33.** *See* § II *supra*.

**34.** Defendants' Exh. A, Proceedings of the Common Council of the City of Syracuse For the Fiscal Year 1979, at 878–79.

**35.** *See* Charter, *supra* note 7, §§ 3–103(2)(c), 3–106(1). The Common Council president's position became vacant because of then-president Neal McCurn's appointment to the federal bench.

seat as councilor-at-large meant that the Republicans now temporarily controlled Common Council, 4–3, and had the power to elect a Republican to fill Magnarelli's old position.[36] At the start of a special meeting three days later to fill Magnarelli's council seat, however, Ross withdrew her resignation. The minutes state that "President Magnarelli ruled that Councilor Ross's resignation had been properly withdrawn under provisions of the Public Officers Law and she was a valid member of the Common Council."[37] The withdrawal created a 4–4 division again.

The Democrats then nominated Richard Wiles, a Democrat, for Magnarelli's old seat. The vote split along party lines, 4–4.[38] President Magnarelli broke the deadlock and voted for Wiles,[39] giving the Democrats control once again. From this elaborate scenario, defendants derive the conclusion that the City Clerk had the ultimate power to determine which party predominated the Council. Hence, they continue, the clerk has duties that could impact on legislation, bringing him with the *Branti* exception.

Defendants' argument greatly overstates the extent of the City Clerk's powers under the Public Officers Law. A rare confluence of facts must all exist, and in exactly the right order, for section 31(4)'s authority to carry any political consequences. A resignation and subsequent withdrawal by a councilor from a party possessing more than a one vote majority (or by a member of a clearly minority political party); a withdrawal effectuated after, rather than before, a subsequent election to fill another vacancy; a Common Council president who votes against his own party's candidate, or who is of the same political persuasion as the party in temporary control before the resignation's withdrawal; voting that proceeds on the merits rather than solely along party lines: any one of these events would nullify the City Clerk's supposed political clout. Even in defendant's example, only the combination of the City Clerk's supposed[40] consent to Ross's withdrawing her resignation, plus Magnarelli's vote for Wiles, gave political control back to the Democrats. Alone, the Clerk's role was a necessary but not sufficient action.

Moreover, defendants' argument contains inherent flaws. Consider the chaotic consequences sure to result if section 31(4) grants the political power defendants claim. Is a different clerk needed every time the majority on the Council shifts temporarily because of illness or absence, be it even for five minutes, just in case in that interim another councilor wants both to tender and withdraw his or her resignation? And what if control of the Council is evenly divided temporarily? Should the Council continue without a clerk? Or hire one without political affiliations? The increased costs, both in money and inefficiency, would be staggering. This *reductio ad absurdum* argument could continue.

The largely theoretical political power under section 31(4) pales beside the mass of routine, strictly ministerial duties of the City Clerk described above. In every case upholding a patronage dismissal against a First Amendment challenge, the positions at stake involved duties significantly more complex and discretionary.[41]

---

**36.** Charter, *supra* note 7, § 3–103(2)(b) states in pertinent part:

> In case of a vacancy in the office of the councilman-at-large, . . . the remaining members of the Council by a majority vote shall appoint a qualified elector of the city to fill the vacancy until the first day of January following the next election at which the vacancy can be filled, as provided by law.

**37.** Defendants' Exh. A, *supra* note 34, at 881.

**38.** *Id.* at 883.

**39.** *Id.*

**40.** The record is unclear whether City Clerk Gallivan played any role in consenting to Ross's withdrawal of her resignation. President Magnarelli may have been the consenting official. *See* text accompanying note 37 *supra.*

**41.** *See, e.g., Ness v. Marshall*, 660 F.2d 517 (3d Cir. 1981) (city solicitor and assistants); *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981) (involving a senior citizens' coordinator, whose duties included feasibility studies, conducting research and recommending proposals to the township supervisor); *Newcomb v. Brennan*, 558 F.2d 825, 829–30 (7th Cir.), *cert. denied*, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d

Because *Branti* formulated its test in such nebulous language, other courts' paraphrases are needed to help delineate the proper scope of the "policymaking" exception. These variations also show that the City Clerk's position falls outside the exception and within the normal proscription on patronage practices. In *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981), the Seventh Circuit stated that "[t]he test is whether the position held by the individual authorizes, either directly or indirectly, meaningful imput into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." The City Clerk, however, does not participate at all in Common Council discussions. Nor does his power to consent to withdrawals of resignations qualify as "meaningful imput." In *Ness v. Marshall*, 660 F.2d 517, 522 (3d Cir. 1981), the court upheld a patronage dismissal of a city solicitor, in part because his functions were "so intimately related to city policy." Plaintiff, however, only records, not reforms, Common Council policy. In sum, considering the aggregate of mostly technical duties performed by the City Clerk, plaintiff's party affiliation is not an appropriate requirement for the effective performance of his job. *Branti, supra*, 445 U.S. at 518, 100 S.Ct. at 1295.

## VII.

As a final defense, defendants-councilors maintain that because they acted "with no intent to deprive plaintiff of any alleged constitutional rights,"[42] a challenge to their actions may not lie under 42 U.S.C. § 1983 (1976 & Supp. III 1979). *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), however, forecloses that argument. Canvassing the language of section 1983, its legislative history and case law, the Court found that section 1983 does not contain a state of mind requirement. 451 U.S. at 534, 101 S.Ct. at 1912. *See also Watson v. McGee*, 50 U.S.L.W. 2373, 527 F.Supp. 234 (S.D.Ohio 1981) (allegations of city's negligence held to state a § 1983 claim); *Haywood v. Younger*, 30 Cr.L.Rep. (BNA) 2227 (E.D.Cal. Nov. 30, 1981) (intent held not to be an element of § 1983 action); *McMullan v. Thornburgh*, 508 F.Supp. 1044, 1052 (E.D. Pa.1981) (defendants need not intend to interfere with a plaintiff's constitutional rights to be liable under § 1983).

## VIII.

Some defendants-councilors complain that the effect of this decision is to grant plaintiff a permanent job as City Clerk. Such concern is unfounded. The Court emphasizes the narrow holding of this case: defendants-councilors' refusal to rehire Visser violated his First Amendment rights because their *sole* reason was plaintiff's political affiliations. The council may always dismiss or fail to rehire plaintiff for legitimate apolitical reasons, even if those reasons are coupled with the constitutionally flawed reason of Visser's political beliefs. *See Mt. Healthy, supra*, 429 U.S. at 287, 97 S.Ct. at 576; *Farkas v. Thornburgh*, 493 F.Supp. 1168, 1173–74 (E.D.Pa.1980), *aff'd mem.*, 633 F.2d 209 (3d Cir. 1980) (table).

While my respect for the rule of law and for the principle of *stare decisis* mandates the decision reached here,[43] I disagree

455 (1977) (deputy city attorney); *Garretto v. Cooperman*, 510 F.Supp. 816, 818–20 (S.D.N.Y. 1981) (worker's compensation law judge); *Bavoso v. Harding*, 507 F.Supp. 313, 315–16 (S.D. N.Y.1980) (city corporation counsel).

**42.** Answer of defendant-councilors ¶ 15.

**43.** Just last week, the Supreme Court reaffirmed the importance of following its precedents. In *Hutto v. Davis*, —— U.S. ——, 102 S.Ct. 703, 70 L.Ed.2d 556 (1982) (per curiam), the Court upheld a 40 year prison sentence imposed on respondent Davis for possession and distribution of nine ounces of marijuana worth $200. In reversing the two lower courts' rulings that the sentence violated the Eighth Amendment's proscription of cruel and unusual punishment, the Court criticized the Fourth Circuit for failing to follow *Rummel v. Estelle*, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). "[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts *no matter how misguided* the judges of those courts may think it to be." *Hutto, supra*, 102 S.Ct. at 705 (emphasis added).

strongly with the reasoning and result of *Elrod* and *Branti*. Like Justice Powell, I am unconvinced that the First Amendment applies to protect public employees who lose positions obtained through their participation in the patronage system. *See Elrod, supra,* 427 U.S. at 380–81, 96 S.Ct. at 2692–93. (Powell, J., dissenting). "Such employees assumed the risks of the system and were benefited, not penalized, by its practical operation." *Branti, supra,* 445 U.S. at 526 n.6, 100 S.Ct. at 1298 n.6 (Powell, J., dissenting).

Even assuming the applicability of the First Amendment, the *Elrod* plurality and *Branti* majority inadequately considered patronage's salutory features. In *Elrod,* the Court recognized three justifications for patronage—the need for effective and efficient government, the need for political loyalty, and the need for patronage to preserve political parties and the democratic process—but held that they were outweighed by the First Amendment rights of belief and association. I disagree.

First, for a government to function, teamwork is essential. As one commentator has written, "[w]hat the Court forgets is that, if government is to work, policy implementation is just as important as policymaking. No matter how wise the chief, he has to have the right Indians to transform his ideas into action, to get the job done." [44] The Supreme Court did not even consider this "important fact of modern governmental life" in its balancing process. [45] A modified spoils system, in which accountability and loyalty to one's superior provides one factor in deciding job retention and advancement, provides incentive for efficient and effective government.

Second, the need to maintain viable political parties deserves much more weight than the one paragraph in which it was considered and rejected by the Supreme

Court. *Elrod, supra,* 427 U.S. at 368–69, 96 S.Ct. 2687–88. As Justice Powell noted in his *Branti* dissent, "[p]atronage appointments help build stable political parties by offering rewards to persons who assume the tasks necessary to the continued functioning of political organizations." 445 U.S. at 527–28, 100 S.Ct. at 1299. Moreover, patronage encourages politics. A candidate's supporters, motivated in part by the possibility of a job or job advancement, engage citizens in dialogue on the political controversies of the day. By contrast, the cutback in permissible patronage practices by the Court, thereby forcing politicians to rely ever more on one-way communication through the media, only hastens the breakdown of political parties and increases voter apathy. Patronage's long history attests to the importance political parties attach to the practice. Justice Holmes' admonition that "[i]f a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it" applies with equal force to the First Amendment. [46]

To be sure, the spoils system, like any other custom, contains abuses. Civil service, tenure practices and unions, however, already adequately shelter most public employees from patronage problems. The small pocket left by the legislative and executive branches for a modified spoils system to play a role should be given deference, not short shrift, by the "least dangerous" branch. *Elrod* and *Branti,* however, command federal judges to act as arbiters in challenges to governmental and legislative employment practices. [47]

I agree wholeheartedly with Judge Aldisert's feelings on this subject:

I am willing to elevate to an exalted status the naked text of the first amendment: "Congress shall make no law . . . abridging the freedom of speech, or of

---

44. Peters, *A Kind Word for the Spoils System,* Washington Monthly Sept. 1976, at 30.

45. *Loughney v. Hickey,* 635 F.2d 1063, 1066 (3d Cir. 1980) (Aldisert, J., concurring).

46. *Jackman v. Rosenbaum Co.,* 260 U.S. 22, 31, 43 S.Ct. 9, 9–10, 67 L.Ed. 107 (1922) (citations omitted) (quoted in *Elrod, supra,* 427 U.S. at 389, 96 S.Ct. at 2697) (Powell, J., dissenting).

47. *Branti, supra,* 445 U.S. at 525, 100 S.Ct. at 1298 (Powell, J., dissenting).

the press." I am willing to describe it as the most majestic of several constitutional guarantees. I am unwilling, however, to allow it to be used as a slogan, the invocation of which excludes consideration of basic accoutrements of a political democracy or other specific or implicit constitutional provisions. Rules regulating a political order may not eviscerate the order itself.

.    .    .    .    .

The first amendment is regarded properly as a shield protecting fundamental rights of individuals against government excess or tyranny of the majority. It is quite another thing to use it as a sword to cut out the heart of the basic processes that form our tradition of self-government. In my view, that is exactly what the Supreme Court has done here.[48]

It is to be hoped that in light of the inadequate attention paid to patronage's benefits in the Supreme Court's balancing test, the inherently broad ramifications contained in the *Elrod-Branti* principles, and the uncertainty created by *Branti*'s nebulous test for determining permissible patronage practices, the Supreme Court will reconsider the wisdom of its two decisions.

### IX.

Finally, certain procedural problems remain to be resolved. Because the temporary restraining order maintained the status quo in protecting plaintiff's position pending this decision, there was no need for plaintiff to be nominated in the January 2 elections. In light of this opinion, a new election is necessary. It is up to the Common Council to decide the date of that election. Plaintiff is to be retained as City Clerk until the Common Council elects plaintiff or some other person to that position for the remainder of the current term. Naturally, the Court anticipates that the election will conform to the principles set forth in this opinion.

It is so Ordered.

---

48.  *Loughney v. Hickey*, 635 F.2d 1063, 1070–71    (3d Cir. 1980) (concurring opinion).