Elsie M. PARADISE, Plaintiff,

v.

Michael C. O'LAUGHLIN, Individually and as Mayor of the City of Niagara Falls, New York, and also as a voting member of the City Council of Niagara Falls, New York; Leo Martel, Individually and as a Councilman of the City Council of Niagara Falls, New York; and Michael V. Redding, Individually and as a Councilman-Elect of the City Council of Niagara Falls, New York, Defendants.

No. CIV–83–1461C.

United States District Court, W.D. New York.

May 4, 1984.

Jaeckle, Fleischmann & Mugel (J. Edmund deCastro, of counsel), Buffalo, N.Y., for plaintiff.

Carl E. Mooradian, Corp. Counsel of City of Niagara Falls (William W. Zarr, Asst. Corp. Counsel, of counsel), Niagara Falls, N.Y., for defendants.

CURTIN, Chief Judge.

In this action brought pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(a)(3), plaintiff Elsie Paradise seeks to permanently enjoin and restrain defendants O'Laughlin, Martel, and Redding, individually and as voting members of the City Council of the City of Niagara Falls, from taking any action to terminate or replace her as City Clerk of Niagara Falls, New York. A hearing was held, and summations have been concluded. The following constitutes

the court's findings of fact and conclusions of law.

Plaintiff, a Republican, was chosen as City Clerk in February of 1982 by the City Council of Niagara Falls, which at that time was composed of a Republican majority (three Republicans and two Democrats). The vote which placed her in her present position was 4–1: three Republican Councilmen and one Democrat voting in favor of her selection, and one Democratic Councilman voting against her. She has served as City Clerk since that time.

Mayor Michael C. O'Laughlin, who is also a member of the Council, Leo Martel, and Michael V. Redding now comprise the Democratic majority of the Council. Mayor O'Laughlin and Mr. Martel had been reelected, and Mr. Redding was elected in the fall of 1983, with his term to commence on January 1, 1984. At present, the remaining members of the Council, Mervin J. Cook and Joseph J. Smith, are Republicans.

During November and December of 1983, newspaper articles and rumors circulated in the Niagara Falls community that Mrs. Paradise was to be replaced as City Clerk. Because of that, she commenced this action on December 27, 1983, contending that the Democratic majority on the Council was trying to replace her solely for political reasons in violation of her first amendment rights. She contends that:

> [t]he position of Clerk of the City Council is a non-policy making, non-confidential governmental position for which political party affiliation is not required for the effective performance of the duties of the said office.

Amended Complaint, ¶ 11.

The court met with the parties in early January, 1984, and issued a temporary order restraining the City Council from removing Mrs. Paradise as City Clerk. Evidence was heard on January 30, 1984, and February 17, 1984, and after several adjournments, summations were heard on April 3, 1984. I delayed hearing summations until after March 24, 1984, when the Council formally voted to terminate the plaintiff and appoint Rita Buchalski as City Clerk in her place. The action against Councilmen Cook and Smith was dismissed by order of January 26, 1984. The action against Francis A. Soda, Chairman of the Niagara Falls Democratic City Committee, was also dismissed.

The duties of City Clerk are set forth in section 45 of the Charter of the City. A review of that section reveals that the City Clerk's duties are ministerial, with discretion given in only minor matters. The City Clerk cannot hire or fire employees, upgrade or downgrade them in salary, or change their classification. The City Clerk issues various licenses but must grant the applications if the papers are in proper order. Budget requests go from the Clerk to the Budget Department and, finally, to the Manager and Council for approval. The Charter does not provide a term for the Clerk's position but states that the Clerk serves "during the pleasure of the Council ..." (Def.Ex. A, City Charter § 7(3)) and "may at any time be arbitrarily removed or discharged by the Council...." (*Id.* at § 20).

A few days after the November 1983 election, in which the Democrats gained control of the Council, articles appeared in the press indicating that a change in the City Clerk's position was contemplated by the Democratic majority. On November 10, 1983, the *Niagara Gazette* quoted Mayor O'Laughlin. When asked if Elsie Paradise might be replaced, the Mayor said:

> That is a position we will certainly look at closely. I have nothing against Elsie Paradise, but will we replace her as city clerk? I'd have to say realistically, we will think about that, yes.

(Plaintiff's Ex. 12B.)

On December 1, 1983, Mayor O'Laughlin and incumbent Democratic Councilmen Martel and Redding received a letter from Chairman Soda of the Democratic City Committee which recommended that "qualified Democrats be considered for the positions of City Clerk, etc." (Plaintiff's Exhibit 9.) Mayor O'Laughlin informed Mr. Soda that he would not be bound by party

dictates (Defendants' Ex. C—letter to Soda, 12–16–83). He and other Councilmen insisted that Soda's directions did not control their decision with respect to filling the City Clerk slot.

A radio station WEBR broadcast of December 29, 1983, represented Councilman Martel as stating that: "Whether Elsie did a good job or not isn't the point. He [Martel] says party politics brought her in two years ago, and now the republicans find the shoe's on the other foot." (Plaintiff's Ex. 2.)

The WEBR reporter also spoke about an interview with incoming Democratic Councilman Michael Redding.

He [Councilman Redding] says that in 1982 Elsie Paradise was brought to the City Clerk's post when the GOP ousted Daniel White in what Redding calls a coldhearted way.

(*Id.*) Furthermore, Redding said that job performance was not important, since this was an issue of party politics, and unfortunately, performance does not always play a large part in such a decision (Tr. at 135).

It appears that Councilman Martel was the prime mover with respect to the termination of Mrs. Paradise. During his testimony, he stated that he wanted her terminated and that he discussed the problem with Mayor O'Laughlin and Councilman Redding and introduced a resolution to end her service. He was in favor of Rita Buchalski, who served as his campaign manager in the November election.

The resolution presented by Councilman Martel to remove Mrs. Paradise remained under consideration until March 12, 1984, when the City Council voted to terminate her and to appoint Rita Buchalski as City Clerk.

No evidence was offered to show that party affiliation was an important requirement for the effective performance of the City Clerk post. To the contrary, the Mayor testified that the position of City Clerk could be performed equally well by a Republican, Democrat, Conservative, Liberal, or a person with no party affiliation.

Councilman Redding agreed with this statement.

At the hearing, defendants attempted to show that her removal was not brought on by political considerations but because of various activities she carried out while in office. This is an afterthought, because while she served as City Clerk, the City Council was satisfied with her performance on the whole, and at times, some of the Council members, including the Mayor, commended her for her good work. Furthermore, when this matter was first brought on in early January, no mention was made at that time of any complaints about her work as City Clerk. Instead, defendants' counsel submitted an affidavit on January 3, 1984, in opposition to injunctive relief, which characterized the City Clerk's position as a policy-making position not deserving of first amendment protections. That affidavit further represented that the City Clerk's position could be changed upon the whim of the City Council. Nowhere does it mention that Mrs. Paradise performed less than adequately in her position.

However, on January 11, 1984, the affidavit of Mayor O'Laughlin introduced the controversy over dog licenses. He stated that he had become aware of the controversy during the summer of 1983. Although O'Laughlin's statements to the press neglected mention of any shortcoming in Mrs. Paradise's work, he stated in an affidavit that the licensing problem was sufficiently serious to warrant dismissal of Mrs. Paradise. Councilman Martel's affidavit, filed along with O'Laughlin's, joined in this personal criticism of Mrs. Paradise's job performance. Councilman Redding also objected to Mrs. Paradise being maintained as City Clerk, but did so on the theory that this lawsuit would preclude a "working relationship with plaintiff and ... [would be] detrimental to building a mutual confidence and rapport necessary between elected officials and their appointees."

During the hearing, the defendants reiterated that Mrs. Paradise's inquiries about the Niagara City Court procedures about

handling dog license fees had caused confusion and unnecessary tension between the Chief City Court Judge and the City Council. She had begun to make inquiry about this problem in the late summer of 1983 at the request of the City Council. Inquiries by the State Department of Agriculture about the City's procedures for collecting dog license fees prompted this investigation. Correspondence from the Chief City Court Clerk to both Mrs. Paradise and the City Manager represents that Mrs. Paradise's "investigation" had caused an upset in the City Court (Def.Ex. B and D).

This correspondence about the dog license fees took place in September of 1983, and from that time until the end of the year, no complaint was made by the Council about plaintiff's conduct relating to this matter. In reporting to the City Manager, William Sdao, Mrs. Paradise had given him a note which told him of the problems she had had with the City Court in regard to the collection of dog license fees and her perceived failure of the court system to prosecute those individuals who were not paying their fees. This memorandum went back to the City Court, which caused the court officials to protest.

At the hearing, Mayor O'Laughlin complained that the plaintiff had gone over the head of the City Court Judge and had contacted the Office of Court Administration. However, testimony revealed that Mrs. Paradise simply contacted a clerk in the Office of Court Administration to find out how the City Court was staffed in order to determine whether there was adequate personnel to process dog license fee complaints. She did not make a formal complaint to the Office of Court Administration on her own.

Councilman Joseph Smith, a Republican, testified that Paradise had been asked by the Council to find out what fees were being charged by neighboring municipalities so that the Niagara Falls fees could be brought up to date. This was done. Voting on the raising or lowering of any fees was done by the Council, and Mrs. Paradise had no discretion in that regard.

Councilman Martel, a tavern owner, blamed plaintiff for raising and collecting fees levied on amusement devices in taverns, but it was then revealed that the City Council had voted in favor of the measure and that she had no discretion with respect to fee increases. It was conceded by Councilman Martel that license fees comprised anticipated revenue of the City, and it was part of the job of the City Clerk to collect them. He also conceded that checking the fees of other cities, if requested by a councilman, would be part of her duties. Councilman Redding agreed that Paradise had done a good job at collecting license fees. He was aware that she had been commended for superior performance by the *Niagara Gazette*. Mayor O'Laughlin agreed that such fees were part of the anticipated City revenue and that the Clerk's duty was to collect them.

Councilman Smith also testified that there had never been any charges of incompetency or inefficiency leveled against Mrs. Paradise. He testified that she had performed well in the office of the City Clerk and had typed up the minutes of Council proceedings, which her predecessor had not done. No Councilman had ever publicly criticized her, and there were no discussions among the Councilmen formally or informally about her performance.

■ The Supreme Court has recognized that the first amendment protects non-policy-making public employees from political dismissal. *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). As City Clerk, Mrs. Paradise performed non-policy-making tasks. She has also demonstrated that her political affiliation was the "substantial" or "motivating" factor behind dismissal. *Mt. Healthy City School Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). If the defendants are unable to demonstrate that legitimate, non-political reasons exist to substantiate dismissal, *Visser v. Magnarelli*, 530 F.Supp. 1165, 1167 (N.D.N.Y.1982), or that political loyalty is a legitimate job qualification,

*McBee v. Jim Hogg County, Texas,* 703 F.2d 834, 837 (1983), then Ms. Paradise is entitled to prevail on her claim.

■ Mrs. Paradise has adequately shown that political overtones infected the decision to remove her from office. The defendants have not argued that party affiliation is a necessary job qualification. Instead, they have presented evidence of non-political reasons to get rid of Mrs. Paradise.

The two complaints about Mrs. Paradise's work which the defendants claim as reasons for her dismissal are insufficient as a basis for dismissal. The canine problem was resolved within a couple of months and did not become a matter of concern until the time of the hearing (Tr. at 17, Martel; at 54, O'Laughlin). The additional complaint that Mrs. Paradise improperly raised licensing fees for recreational machines in taverns is equally insubstantial. She was not responsible for license increases, but only for collection. The fees were increased as a result of a vote by the City Council—a vote which Martel, a tavern owner, opposed.

Because neither of these "reasons" rises to the level of a believable basis for dismissal, and because the City Council has already voted to replace Paradise with Councilman Martel's Election Campaign Chairman, Rita Buchalski, it is apparent to the court that her dismissal was substantially motivated by the kind of political reasons suggested by the newspaper and radio items introduced as evidence by the plaintiff.

Recently, Judge John T. Elfvin in the case of *Boyd v. Niagara County* (CIV–83–775E) permitted the removal of Ms. Boyd as Clerk in Niagara County. In the *Boyd* case, however, the defendants were able to offer evidence showing unsatisfactory performance, giving good reason for her termination and replacement. In this case, the performance of the plaintiff in her office was satisfactory as a whole, and replacement came about for political reasons.

I note the reservations expressed by Justice Powell in *Elrod, supra,* 427 U.S. at 380–81, 96 S.Ct. at 2692–3 and by the Honorable Howard G. Munson in the Northern District of New York in *Visser, supra* at 1173–74. *See also Dusanenko v. Maloney,* 560 F.Supp. 822, 828 (S.D.N.Y.1983). As Judge Munson pointed out, there are salutary features in the patronage system. Furthermore, most citizens in the community have their only contact with their City government through the City Clerk's Office. The image that the party in power desires to put before the public is revealed day in and day out by the activities of the City Clerk. Nevertheless, I must respect and follow the principles set forth in the Supreme Court decisions.

I emphasize that this does not give a permanent appointment to the City Clerk. The Council can always dismiss or fail to rehire the Clerk for legitimate, apolitical reasons.

Plaintiff is entitled to injunctive relief. The Council is directed to take up the problem of the City Clerk appointment again. They are enjoined from removing and replacing the plaintiff on the present record. Because I had directed that the hearing in this matter be consolidated with trial on the merits in accordance with Rule 65(a)(2) of the Federal Rules of Civil Procedure, the Clerk is directed to enter final judgment accordingly.

So ordered.